**756**

Application of Alexander F. MacLEAN and Adin L. Stautzenberger.

Patent Appeal No. 8580.

United States Court of Customs and Patent Appeals.

Feb. 10, 1972.

Marvin Turken, New York City, attorney of record, for appellants.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Fred W. Sherling, Washington, D. C., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

WORLEY, Chief Judge.

The issues here are whether the Board of Appeals erred in affirming the examiner's various rejections of claims 1–6 [1] under 35 U.S.C. §§ 102, 103 and 112.

The invention relates to a method of separating acetonitrile impurity from acrylonitrile by a process of extractive distillation employing water as the extractant. Appellants' brief contains the following discussion of the problem extant in the prior art and their solution thereto:

> In the manufacture of acrylonitrile, a crude mixture is generally obtained containing an appreciable amount of a chemical somewhat similar in chemical structure to acrylonitrile, viz., acetonitrile, as well as other impurities. While these other impurities may be conveniently removed from the crude mixture by such means as ordinary fractional distillation, the acetonitrile is more difficult to remove because its boiling point, 82°C. at atmospheric pressure, is fairly close to that of acrylonitrile, 78°C. Thus, to separate these compounds by ordinary fractional distillation, an extremely large fractionating column would be required, which would be very expensive to build if not economically and/or technically infeasible. * * *
>
> The necessity to use a particularly large and expensive fractionating column is avoided by means of the process of applicants' invention wherein extractive distillation is employed using water as an extractant. ("Ex-

---

1. Appearing in application serial No. 540,810, filed April 7, 1966 and entitled "Distillation". The application is a continuation-in-part of serial Nos. 480,260, 796,744, 565,543, and 256,368, filed August 17, 1965, March 3, 1959, February 15, 1956 and November 14, 1951, respectively.

tractive distillation" is fractional distillation carried out in conjunction with the injection into the fractionating column of a liquid extractant which has a greater affinity for one component than the other and which forms a solution with such component having a boiling point farther away from that of the other component than the original component itself. Extractive distillation thus improves separation by increasing the difference between the boiling points of the components to be separated and also by taking advantage of a so-called "solvent extraction" effect, i. e., the greater affinity of an extractant (or solvent) for one component of a mixture than for the other resulting in a so-called "leaching out" of the component having greater affinity for the extractant.)

Claims 1 and 3 are representative:

1. A process for the purification of acrylonitrile containing acetonitrile as an impurity which comprises subjecting said impure acrylonitrile to a continuous extractive distillation employing water as extractant by continuously introducing said impure acrylonitrile into a fractionating column, continuously introducing water into the upper portion of said column at a point on said column above the point of introduction of said mixture to establish an extractive distillation zone in said column between said points, the temperature in said column being sufficient to avoid the formation of a separate acrylonitrile liquid phase in said zone, and continuously taking off as a distillate aqueous acrylonitrile, the ratio of acrylonitrile to acetonitrile in said distillate being greater than that in the original mixture.

3. Process as set forth in claim 1, in which the amount of water introduced into said upper portion is such that the liquid in said zone is preponderantly water.

With that background concerning appellants' invention in mind, we turn to the issues presented by the decision of the board and appellant's reasons of appeal. As those issues are quite diverse in nature, we will discuss them separately.

### The 35 U.S.C. § 103 Rejection

The examiner rejected the subject matter of claims 1 and 2 under § 103 in view of the Teter[2] and Benedict[3] references. At the time appellants' invention was made, Teter had described separating substantially pure acrylonitrile from mixtures comprising acrylonitrile and "substantial" amounts, e. g. 50% by volume, of acetonitrile by a process of azeotropic distillation employing water as the azeotrope-forming substance.[4]

Recognizing that Teter apparently uses a small quantity of water to effect separation in his azeotropic distillation process than appellants use in their extractive distillation process, the examiner turned to Benedict, who discusses and compares the advantages of extractive distillation and azeotropic distillation processes for separation of mixtures whose components boil too close together for economical use of ordinary fraction-

2. U. S. Patent No. 2,415,662, issued February 11, 1947.

3. "Extractive and Azeotropic Distillation," Transactions of American Institute of Chemical Engineers, pp. 353–370 (June 24, 1945).

4. Teter states:
We have discovered that acrylonitrile and acetonitrile each forms an azeotrope with water in the presence of the other and that the temperature differences in boiling points of the respective azeotropes is substantially greater than that of the

nitriles alone. The boiling point of the acrylonitrile-water azeotrope is 69.5° C. while that of the acetonitrile-water azeotrope is 75.5° C. Thus the difference in boiling points of the respective azeotropes is 6° C. while that of the pure nitriles is only 4° C. Though this difference in boiling points is not great, it has been found to be sufficiently large to make possible and practical the direct separation of acrylonitrile substantially free from acetonitrile by fractional distillation. * * *

al distillation. Benedict points out that, while both processes maintain an appreciable concentration of solvent on most or all of the plates of the distillation column and both exaggerate the difference in volatility between mixture components, the processes differ

\* \* \* in the means used to maintain the desired solvent concentration on the plates of the columns. In extractive distillation the higher concentration of solvent is maintained by virtue of its non-volatility and the fact that it is charged at a point high up in the column. Azeotropic distillation may be conceived of as related to extractive distillation if the solvent volatility is sufficiently increased so that an azeotrope is formed with one or both of its components. In extractive distillation the solvent is necessarily taken from the bottom of the principal column. In azeotropic distillation most of the solvent is taken off as overhead, and relatively small amounts are drawn off with the bottoms.

Benedict goes on to discuss the relative advantages of extractive distillation vis-a-vis azeotropic distillation—more solvents are available to effect a given separation, more flexibility is available in design and operation of the distillation process and less heat input is required for a given separation. "To take advantage of the selective action of the solvent in extractive distillation," Benedict states, "it is merely necessary to run at fairly high solvent concentrations."

In light of Benedict, the examiner considered it would have been obvious to one of ordinary skill in the art at the time appellants' invention was made to adjust or increase the quantity of water used in the Teter process in order to carry out an extractive distillation process. The board agreed, adding:

\* \* \* The Benedict et al. publication teaches that extractive distillation and azeotropic distillation are two well known alternative techniques for separating materials of close boiling points, and we can perceive nothing unobvious, within the meaning of 35 U.S.C. 103, in adopting the former technique in lieu of the latter technique of the Teter et al. patent.

We find no error in that determination. From a consideration of the references, it seems to us, as it did to the board, that one of ordinary skill in the art in 1951 would have been aware that an extractive distillation process was a viable alternative to the azeotropic distillation technique of Teter for separating liquids of close boiling points, and that water, being less volatile than the acetonitrile or acrylonitrile components of the mixture while also possessing the capability of forming azeotropes with either component, would be a suitable third component in that process if used in sufficient concentration. Appellants have presented no argument or evidence persuasive of the patentability of broad claims 1 and 2, which define no more than the mere application of the concept of extractive distillation to the problem of separating acrylonitrile and acetonitrile.

The rejection of claims 1 and 2 under § 103 is affirmed.

### The 35 U.S.C. § 102 Rejection

The board also affirmed the examiner's rejection of claims 3–6 "as anticipated by Kemp[5] et al. under 35 U.S.C. 102." Appellants do not argue that the subject matter of claims 3–6 is not "described" by Kemp within the meaning of 35 U.S.C. § 102(e). Rather, appellants have attempted to render Kemp unavailable as *prior* art by relying under the provisions of 35 U.S.C. § 120 on an asserted earlier description of the claimed invention appearing in their aforementioned application serial No. 256,368, which was filed November 14, 1951, before the filing date of Kemp. The question presented is whether the

---

5. U. S. Patent No. 2,681,306, issued June 15, 1954 on an application filed February 6, 1952.

invention of claims 3–6 has been "disclosed in the manner provided by the first paragraph of section 112" in the '368 application, as § 120 requires and as appellants urge.

The board did not think the invention of those claims is disclosed in the '368 application in a manner satisfying the requirements of the first paragraph of § 112, nor do we. In particular, the board agreed with the examiner that certain claim language defining how much water is employed in the extractive distillation process—for example, an amount such that the liquid in the extractive distillation zone and/or withdrawn from it is "preponderantly water" (claims 3–6), or an amount "greatly in excess of that which would form azeotropic mixtures with the constituents of said impure acrylonitrile" (claim 6)—found no antecedent basis in appellants' '368 application. As the board pointed out, the earlier application describes in detail only an extractive distillation process in which water is introduced into the column "at a rate sufficient to maintain the water concentration in the liquid phase above 93% by weight," and does not suggest at all that a mere preponderance of water (above 50%) would be effective to accomplish separation.

Appellants appear to recognize that their '368 application contains no express language corresponding to the controverted claim limitations. They draw attention, however, to some broad language in the '368 application and its original claims disclosing "an extractive distillation employing water as the extractant" apparently without any limitation as to the amount of water used, as well as the specific disclosure in that application of using sufficient water to maintain the liquid phase concentration above 93% by weight. They also cite several publications for their general statements that extractive distillation, by definition, involves charging a relatively nonvolatile solvent to the distillation column to maintain an "appreciable" or "high" concentration of solvent on all column plates. From those cited publications and portions of the '368 application, appellants seek to derive support for their argument that the language of the '368 application "inherently denotes to the person skilled in the art the concept of using a preponderant amount of water extractant," as set forth in claims 3–6.

We cannot agree. The fact remains that the '368 application fails, in the words of § 112, to "contain a written description of the invention" recited in those claims. Certainly the single exemplary disclosure of using 93% by weight water in the liquid phase provides no support or description of the recited range "preponderantly water," i. e. anything above 50% by weight. Appellants can take no comfort in the broad, general language of their '368 application or the cited publications—"appreciable concentration" or "high concentrations"—for it too is of no aid in determining that the '368 application inherently discloses maintaining merely a preponderant amount of water in the liquid phase while carrying out the particular separation process here. In short, appellants have not established a basis for claiming the broad range represented by the language "preponderantly water." See In re Lukach, 442 F.2d 967, 58 CCPA 1233 (1971); In re Baird, 348 F.2d 974, 982, 52 CCPA 1747, 1758 (1965), and cases therein.

Nor does it appear that they have presented a disclosure which would *enable* those in the art to carry out the specific process of separating acetonitrile from acrylonitrile by maintaining merely a preponderance by weight water in the liquid on the plates. Indeed, the only available evidence in this record, other than appellant's specification, which addresses itself specifically to the acrylonitrile-acetonitrile separation process involved suggests that separation cannot be achieved with much less than 93% by weight water maintained on

each plate.[6]  The rejection of claims 3–6 under § 102(e) in view of Kemp is affirmed.

The view we take renders it unnecessary to consider a third issue arising against all claims under 35 U.S.C. § 112, second paragraph.

The decision is affirmed.

Affirmed.

6.  The aforementioned Kemp patent states:

The objects of this invention are accomplished by fractionating an impure acrylonitrile as previously described in the presence of about 95 to 98 mol per cent of water and preferably from 96 to 97.5 mol per cent of water.  To carry out this process effectively the fractionating column should have no fewer than 50 plates and preferably, the column should have at least 60 plates.  Increasing the number of plates in the column may permit a slight lowering of the mol percentage of water for equivalent operation in efficiency of impurity removal, *but in no case can appreciably less than 95 mol per cent of water be used if reasonable removal of the impurity is to be effected even though the number of plates is increased to 100 or even 200.*  Preferably a column with from 60 to 90 plates is used with the feed introduced at an intermediate point as from ⅝ to ⅞ the way from the bottom to the top; the water solvent is introduced onto or near the top plate as is the external reflux to provide there and *on most of the plates in the column at least 95 mol per cent of water;*  *  *. [Emphasis supplied.]